## Case No. 14,768.
### UNITED STATES v. CERVANTES.
[1 Hoff. Land Cas. 9.] [1]

District Court, N. D. California. June Term, 1853.[2]

MEXICAN LAND GRANT — CONCESSION — APPROVAL OF DEPUTATION—CONDITIONAL GRANT.

1. To constitute a definitively valid or complete title two things are necessary—First, a concession by the governor; and secondly, the approval by the territorial deputation, or, in the event of their refusal, by the supreme government.

2. Where the condition of a grant, which had not been approved by the deputation, required a house to be built and the land cultivated within one year from its date, and no house was built or cultivation made within six years, *held*, that the claimant had, under the rules of decision laid down by the supreme court, no equities which entitled him to a confirmation.

Claim [by Cruz Cervantes] for [the rancho of San Joaquin or Rosa Morada] a tract of land within boundaries supposed to contain two sitios of ganado mayor, granted to appellee on the first of April, 1836, by Nicolas Gutierrez, superior political chief, ad interim, of California. The claim was confirmed by the board of land commissioners. The United States appealed.

S. W. Inge, U. S. Dist. Atty.
Jones & Strode, for appellee.

HOFFMAN, District Judge. This case comes up on appeal from the decree of the board of commissioners to ascertain and settle private land claims in California. Could I have consulted my inclinations, I should have refrained from expressing opinions upon any of these cases, and would willingly have contented myself with affirming pro forma every decision of either the former or the present board, and remitted the case to that tribunal by whose decisions alone these questions will be finally determined. But I have not felt at liberty to shrink from this part of the duties imposed by law upon this court, nor to withhold the expression of its opinions, however immaterial, as regards the final results, its decisions may be. If these opinions shall, on some points, differ from

1 [Reported by Numa Hubert, Esq., and here reprinted by permission.]
2 [Reversed in 16 How. (57 U. S.) 619.]

the conclusions to which the board of commissioners has in this case arrived, it is with the full knowledge that their opportunities for examination and consideration have been far greater than my own, and that in dissenting from them I may fall into error. Were the consequences of my decision more serious, it would not be without great regret that I should find myself led to a conclusion differing in any respect from the opinions of so able and learned a tribunal.

By the fifth article of the rules and regulations of November 21st, 1828, prescribed by the general government, in pursuance of the sixteenth article of the general colonization law of 1824, it is provided "that grants to private persons or families shall not be held to be definitively valid without the previous consent of the territorial deputation, to which end the respective expedientes shall be forwarded to it." In this case, no approval of the territorial deputation is shown.

It is clear, from the very terms of the law, that to constitute a "definitively valid" or complete title, two things were necessary,—First, a concession by the governor; and secondly, the approval by the territorial deputation, or, in the event of their refusal, by the supreme government.

It is contended that the original grant or concession by the government passed a perfect title or estate in fee to the claimant, subject only to the condition that it might be annulled by the refusal of both the territorial deputation and the supreme government to confirm it. I have been unable, after much consideration, to assent to this construction of the regulations of 1828. The concession does not, on its face, purport to be an absolute grant; for the land is declared to be "the property of the petitioner, subject to the approval of the deputation." The right of granting being by law vested in the governor, with the approval of the deputation, or, in case of their refusal, that of the supreme government, I do not perceive how, without such approval, the complete title can be deemed to have passed. If the refusal of the deputation is considered merely a condition subsequent, which on its happening would divest a fee previously vested, the effect attributed to it is precisely that of the other conditions in the grant, admitted to be conditions subsequent. But these conditions operated on an estate supposed to have become "definitively valid." Can it be said that that which the law declares necessary to the "definitive validity" of a grant is identical in its effect with a condition which, on its happening, will divest an estate already "definitively valid?" That the grant by the governor had some validity is not denied. It was the performance of a part, perhaps the most important part, of the acts necessary to complete the title; but it was not the performance of all, nor did it purport to be. Until, then, either the territorial deputation or the supreme government had given their approval, the grant remained not "definitively valid," or in other words, inceptive and incomplete; and a confirmation and patent by the United States are necessary to pass the absolute title to the claimant.

Any other view of this question would, it seems to me, deprive the deputation of the important functions entrusted to them. Their right was not merely a qualified right to take from a petitioner land already absolutely granted to him, but it was the right to say whether or not the land should be granted to him at all; and until they or the supreme government had consented to the grant, the absolute or complete title cannot be deemed to have passed out of the Mexican nation. The title, then, of the claimant being found to be inchoate or imperfect, his right to a confirmation and perfection of it by the government of the United States must be tested by the principles laid down in similar cases by the supreme court. Had he gone on to perform the conditions, and confer the benefits on the Mexican nation, as stipulated for in his grant, no objection could be urged why this government, succeeding, as it does, to all the rights and duties of Mexico, should not perfect his title. That the settlement and cultivation of the vacant lands of the republic formed the sole consideration of these grants is not disputed; and in this particular case the ability of the petitioner to render this equivalent for his concession seems to have been the subject of particular investigation, for the governor is at pains to inform himself whether or not the petitioner had, as he alleged, any stock to put on the land, or the means of getting any.

The grant bears date on the first of August, 1836—and is made on condition, among other things, that the petitioner shall within one year, at farthest, build on the land a house, which shall be inhabited. It is subsequently provided that should he contravene these conditions, "he shall lose his right to the land, and it may be denounced by another." The juridical possession which the grant directs him to solicit of the respective judge, was never applied for until the year 1841; and no occupation or cultivation of the land by him is distinctly shown until 1846, ten years after the grant. The witness Godey testifies that in 1846 he saw the claimant residing on the rancho; and adds, that the house he lived in seemed to be several years old. Pacheco, the only other witness on this point, states that he does not exactly recollect the time when the claimant began to reside on his rancho, but thinks it was about two years after the revolution of Chico and Gutierrez. So far, then, as appears, there was a total neglect on the part of the claimant to comply with any of the conditions of the grant for a period of from five to eight years. If, then, we are right in regarding the title he has received only as inchoate or imperfect, the necessary authorities not having concurred in making the grant, the inquiry presents

itself, has he a right to demand of the United States that they should go on and perfect it? There is no doubt that under the treaty, as well as by the laws of nations, such title as the claimant had acquired when the sovereignty was changed, was secured to him as private property, and the question is, what was that right, according to the laws and usages of Mexico at the time of the cession? If the title is to be decreed, and a patent awarded, it must be on the same grounds as those on which the Mexican authorities would have been bound to decree it had a perfect title been solicited from them. De Villemont v. U. S., 12 How. [53 U. S.] 267; Glen v. U. S., 13 Pet. [38 U. S.] 257.

The rule as laid down in U. S. v. Kingsley, 12 Pet. [37 U. S.] 484, is, "that the United States succeeds to all those equitable obligations which we are to suppose would have influenced the former government to secure to its citizens their property, and which would have been applied by it in the construction of a conditional grant to make it absolute; and further, that the United States must maintain a right of property, under the treaty, by applying to it the laws and customs by which those rights were secured before the cession of the country, or by which an inchoate right of property would, by laws and customs, have become a perfect right." The inquiry is not so much what would the Mexican authorities, had there been no change in the circumstances of the country, or in their policy, have in point of fact done, as what they were, by their laws and customs, and in equity and good conscience, bound to do. Were they bound to confirm and perfect the title of this claimant? or were they at liberty to consider his rights as abandoned and lost, and refuse to accept, after so long a delay, his performance of the conditions of his concession, and treat the land as having reverted to the public domain, to be disposed of as present circumstances or policy might require? Grants or concessions of land upon condition have been repeatedly confirmed by the supreme court. It will, it declares, liberally construe a performance of conditions, precedent or subsequent, in such grants; nor will it "apply, in the construction of their conditions, the rules of the common law." U. S. v. Kingsley, ubi supra. Thus, where the full performance of the condition must have been a matter of indifference as well to the king of Spain as to the United States, after the cession of Florida, it appearing that a performance had been commenced within the time limited, the grant was confirmed. Arredondo's Case, 6 Pet. [31 U. S.] 691. So, when the grantee had in good faith begun to build his mill (which was the condition of his grant)—expended five thousand dollars towards it—had his horses and negroes stolen, while his mill was being built—had his mill dam carried away by a freshet—rebuilt his mill in 1827, which was destroyed by fire the same year—and the year after built another, of seventy horse power—the

court determined that the claimant had shown a sufficient performance of the condition, cy prés—and the acts he had done amounted to a compliance with the condition, according to the equitable doctrines governing such cases. On the other hand, where, by the condition of the grant, one year was allowed for making the improvements required by the regulations, and three years for making an establishment on the premises, and the claimant never took possession of the land until long after the cession of the country, the court rejected the claim, disregarding the excuse offered by him, that hostility of the Indians, and official duties, prevented him; and observing that as to the first, he took his concession subject to that risk; and as to the second, that he held his office when the concession was made, and knew its duties. The court even went so far as to say, with reference to the condition, "that it was undoubtedly necessary that an establishment should be made within three years—such being the requirement of the concession, in concurrence with the regulations." In U. S. v. Boisdoré [11 How. (52 U. S.) 63] the consideration of the grant was, that a stock farm should be established on the land solicited, and that such an establishment was to be "for all the family" of the petitioner; and on it he was to employ all his force of negroes. The evidence showed an occupation of the land for forty years; that it had been cultivated, to some extent, from the date of the grant, and that stock had been kept there, but that such occupation had been by only a single mulatto; and that the petitioner had abandoned the idea of taking his whole family to the place, and employing all his negroes there. The court considered it altogether inadmissible that such trifling occupation, in utter neglect of Boisdoré's promises to the Spanish authorities and the duties imposed by his grant, fastened an equity on the conscience of the king of Spain to complete the grant. It may be proper to remark, however, that it is stated in the dissenting opinion of Mr. Justice McLean, that the grant was rejected by the majority of the court for want of certainty in its calls.

It is urged with much earnestness and ability by the counsel for the claimant, that the only penalty attached to a nonperformance of the conditions of the grant was that the land was liable to be denounced by another—and that upon such denouncement it might have been regranted, if then vacant; but that no denouncement having been made, nor the Mexican authorities availed themselves in any way of their right to treat the land as having reverted to the public domain, and the petitioner having gone on to perform the conditions, with the acquiescence of the government, he ought not now to be disturbed. I am deeply impressed with the force of these considerations. But if the view taken of the effect of the absence of the approval of the deputation be correct, the land cannot be

deemed to have been at any time finally alienated by the Mexican authorities; and the question is not whether a forfeiture should be insisted on, but whether the United States are bound to complete a transfer of their property which has as yet been only partially made. It cannot, I think, be denied that after the expiration of the year from the date of the grant, and up to the time when the claimant performed the conditions, the land, by Mexican law and usage, might have been denounced and regranted. Such was the express condition of the grant. But that condition also provides that in the event referred to, the petitioner shall lose his right to the land. Whether or not in the case of a complete and final grant the Mexican government could only take advantage of the forfeiture by the process of "denouncement," it is not necessary to inquire—for this is not a complete grant. It would seem far more reasonable to suppose that it could. The condition provides that the petitioner shall "lose his right to the land" in case of its violation. If, upon denouncement of the land, it could have been regranted, it would seem that the government must have had the right to make any other disposition of it which any change in their policy or circumstances might require. Whether such regrant or other disposition would have been made without a previous inquisition into the fact of forfeiture is not very clear. By the eleventh article of the regulations of 1828, it is provided that the governor shall designate to the new "poblador" a suitable time within which he shall occupy and cultivate the land under the conditions, and with the number of families stipulated for, with the understanding that if he shall not do so the grant shall be null. In this case, at least, it would seem that the title vested in the government ipso facto on the happening of the breach. But the inquiry in the case at bar is immaterial, for the full title has never passed out of the Mexican government; and the question is not whether the United States acquired, by the treaty, a right to enforce a forfeiture, but whether the claimant has a right to require this government to complete his title. No facts appear upon the record which serve to explain or excuse the long delay of the claimant; nor is there any very distinct proof of the nature of the occupation he finally took, or at least of the extent of the cultivation or amount of expenditures made by him upon the land. Had the Mexican government, at the date of the cession of this country, found itself in the precise position of the United States. with its interests, its policy, and the circumstances of the country radically changed, it is more than doubtful whether it would or ought to have felt itself bound to complete this grant, as the United States are now urged to do. If there was no obligation upon them to do so, and they were at liberty to refuse or comply, we are in the same situation, and the confirmation of this

title must be obtained from another department of this government. Were I at liberty to follow blindly the dictates of my own judgment, I might, perhaps, have confirmed this title. But governed as I am bound to be by the principles established by the supreme court, I have been unable to resist the conviction that a confirmation of this claim would be a departure from the spirit, if not the letter of the rules of decision laid down in the more recent cases. If those rules are hereafter to be modified or departed from, it must be by the tribunal by which they were established. And if, in this case, the equities of the claimant can receive at its hands a more liberal construction and a more favorable consideration than I have felt at liberty to give them, no one will acquiesce in the result more cheerfully than myself.

Since the above was written, I have been informed by Señor Covarrubias, an intelligent Mexican gentleman of this country, that the revolution of Chico and Gutierrez occurred in the year 1836. The "revolution" seems to have been one of those transient and slight disturbances so common in this country; and more to be likened to the outbreak of a mob or a riot in a city than one of those historical events of which judicial notice could be taken. But assuming that the court is judicially informed of the date of its occurrence. the claimant has still, under Pacheco's testimony, failed to comply with the conditions of his grant for more than one year after the expiration of the term limited for their performance; nor does he prove, allege, or pretend the slightest excuse for so doing. But the testimony of Pacheco is inconclusive: That witness says he does not exactly recollect the time when claimant commenced residing on his rancho, but believes it was about two years after the revolution of Chico and Gutierrez. The evidence, however, shows that judicial possession was not applied for till 1841, five years after the grant. Pacheco was one of the assisting witnesses on that occasion, and he does not say that at that time even the claimant had ever built a house or cultivated the land. If the witness who, in 1846, saw a house on the rancho which seemed to be "several years old," is to be believed, the fair inference is that the house could not have been built before 1842 or 1843, six or seven years after the grant. On the whole, I conclude that there having been no performance or attempt at performance until long after the expiration of the term limited, and no excuse being suggested or pretended, I am not at liberty, under the rulings of the supreme court, to confirm the imperfect title of the claimant. Upon the other questions made in this case it is unnecessary to express an opinion.

[NOTE. The cause was taken on appeal to the supreme court, where the decree above was reversed. and the cause remanded to this court, with instructions to permit certain amendments to be made in the pleadings. 16 How. (57 U.

·  ·

S.) 619. The decree of this court confirming the claim of Cruz Cervantes (Case No. 2,560) was affirmed on appeal to the supreme court. 18 How. (59 U. S.) 533.]

UNITED STATES (CERVANTES v.). See Case No. 2,560.